[Civ. No. 16497. First Dist., Div. Two. Oct. 18, 1955.]

RICHARD ZANON, a Minor, etc., et al., Appellants, v. THOMAS J. MOHER et al., Respondents.

Dennis L. Woodman for Appellants.

Dana, Bledsoe & Smith and Joseph W. Rogers, Jr., for Respondents.

KAUFMAN, J.—This is an appeal from a judgment in favor of defendants after jury verdict in a personal injury action. The appeal is based on the ground that it was error on the part of the trial court to refuse to give an instruction on the doctrine of last clear chance.

At about 10 a. m. on August 21, 1952, Richard Zanon, aged 7, was playing in front of his home in the 1400 block on Balboa Avenue, Burlingame. The accident occurred when Richard attempted to cross the street from behind a parked

car with his friend, David Gjerdum, and was hit by a car driven by defendant Thomas J. Moher, who was driving southerly on Balboa toward its intersection with Hillside, an arterial boulevard. Defendant, a 16-year-old boy, was driving a Ford convertible with the top down. He had with him two passengers of about the same age, Vance Bigham and Peter Brown, who testified at the trial.

Richard's home was at 1409 Balboa, the third house from the intersection of that avenue with Hillside. The Lemos residence was the next house north of the Zanon home. Defendant's witnesses placed a parked car, which they claimed obstructed their view of the boy, in front of the Zanon residence near its north boundary, whereas Richard's friend David, placed it near the north boundary of the adjoining Lemos residence. The lots are 50 feet in width. Balboa Avenue is 50 feet wide, and runs north and south. There is a rise or hump in the 1400 block of Balboa, the crest of which was located on a diagram of the area by Richard Zanon's father, one of the plaintiffs, as approximately 120 feet north of the northern boundary of his residence.

Defendant testified that his speed was about 20 miles per hour as he neared the scene of the accident. He first saw Richard when he appeared from behind a car parked on the west side of the street. Defendant's car was just then beginning to pass the parked car and the boy was a few feet south of it. These locations were marked on a diagram introduced as defendant's Exhibit A. When defendant first saw plaintiff the distance between the front of defendant's car and the boy was not more than 25 feet. Defendant said that he applied his brakes and swerved sharply to the left, but was unable to avoid colliding with plaintiff with the right front fender of the car. It was but a fraction of a second, he said between the time he first saw the boy and the impact, and the boy had moved only a foot or two further out into the street in the interval.

The passengers in the convertible, Bigham and Brown, testified that they saw Richard at about the same time defendant did. They shouted at the instant they saw the boy, and at the same time defendant stepped on the brakes and swerved the car. Bigham estimated the distance from the front of defendant's car to the plaintiff, when he first saw him, as about one and one-half car lengths or 20 feet, and that plaintiff was then about 7 feet south of the parked car. Brown thought that the boy was between 5 and 10 feet south

of the parked car as he came into view, and defendant's car was at this time beginning to pass the parked car.

David Gjerdum, who was 7 years of age at the time of the accident, testified that just before it occurred he was walking with Richard about 1 or 2 feet to his rear and 1 or 2 feet to his side; that he first saw defendant's car when he had stepped out just far enough so he could see around the parked car; that when he first saw the car it was coming from a "hump" in the road. He placed the position of the parked car as at about the northern boundary of the Lemos residence, a distance of approximately 70 feet from the crest of the "hump" as shown on the diagram. He said that he heard the honk of a horn and one of the boys in the car yelled to Richard. Richard was a deaf mute and could not hear. David said that before the impact defendant's car swerved and slowed. David, as well as plaintiff's sister, Linda Zanon, testified that the car was going the speed usually travelled by cars on El Camino Real. David did not testify as to his or plaintiff's position in the street nor the location of the point of impact. He stated that he knew as soon as he saw the car that plaintiff was in trouble, and that he couldn't do a thing about it because Richard was deaf. Richard was then only a foot or two ahead and a foot or two to the side of David.

Linda Zanon, Richard's sister who was on the lawn in front of her home, noted on the diagram (Defendant's Ex. A) where she first saw defendant's car. She placed its position as approximately the same point where defendant testified his car was when he first saw plaintiff. She placed the point of impact some 12 feet to the north of the point indicated by defendant, and several feet to the east. She said that between the time she first saw the car and the moment of impact, it swerved to its left but did not slow down. She remembered only one parked car but did not testify as to its location or position relative to that of defendant's car or the plaintiff.

 If there is any evidence in the record which would reasonably support a recovery on the theory of last clear chance, then it would be error for the trial court to refuse to instruct the jury on that doctrine. (*Bonebrake* v. *McCormick*, 35 Cal.2d 16, 18 [215 P.2d 728].) The evidence must be reviewed in the light most favorable to appellant in order to determine whether the doctrine was applicable. (*Selinsky* v. *Olsen*, 38 Cal.2d 102 [237 P.2d 645].) In *Daniels* v. *City*

*& County of San Francisco,* 40 Cal.2d 614, 619 [255 P.2d 785], it is said that an instruction on the doctrine is proper when there is evidence showing: "(1) That plaintiff has been negligent and, as a result thereof, is in a position of danger from which he cannot escape by the exercise of ordinary care; and this includes not only where it is physically impossible for him to escape, but also in cases where he is totally unaware of his danger and for that reason unable to escape; (2) that defendant has knowledge that plaintiff is in such a situation, and knows, or in exercise of ordinary care should know, that plaintiff cannot escape from such situation; and (3) has the last clear chance to avoid the accident by exercising ordinary care, and fails to exercise the same, and the accident results thereby, and plaintiff is injured as the proximate result of such failure."

Appellants say that elements (1) and (2) are present here, since plaintiff was crossing the street with his head turned in the opposite direction from which the car was approaching, and that defendant admitted seeing plaintiff looking in such direction. They contend that there was also evidence to support the third element, for "in the light of the opposing factual considerations as to the distance of the parked vehicle from the Zanon property, it was for the jury to determine whether the defendant had a last clear chance to avoid the accident by exercising ordinary care. (*Root* v. *Pacific Greyhound Lines,* 84 Cal.App.2d 135, 138 [190 P.2d 48]; *Daniels* v. *City & County of San Francisco, supra.*)" The above quotation is the entire discussion and analysis of the evidence set forth in appellant's argument.

In the instant case there is no circumstantial evidence that defendant did see the boy in time to have avoided striking him. Appellants apparently claim that the conflict in the estimates of the location of the parked car is sufficient to establish that defendant must have seen appellant sooner than he contends that he first saw him. Mrs. Lasota who lived at the Lemos home at 1413 Balboa, which adjoined plaintiffs' home on the north, was called as a witness to testify that she had parked her gray Ford car on that day at the west curb in a position which placed the car almost entirely in front of the residence to the north of the Lemos home. David, appellant's little friend, placed the parked car which had blocked his vision, south of this location, and almost entirely in front of the Lemos home. Appellants have

no testimony in the record to show that a gray Ford was the parked car from behind which the boys emerged. A police officer who came to the scene of the accident within about half an hour after it occurred, testified that there were cars in the vicinity but was not questioned as to the number, kind or location. Linda testified that she remembered only one parked car, but was not asked where it was, what kind it was, or how it was related to the accident. Defendant and his witnesses were not asked to describe the car which blocked defendant's view. Richard's mother, who arrived at the scene immediately, was not asked to describe the parked car, nor was David Gjerdum asked anything about the type of car which blocked his view.

It is true that David placed the location of the parked car some 50 feet north of where defendant's witnesses placed it, but his version of the happening of the accident, in the light of last clear chance, does not disagree substantially with defendant's version. Although he was only between 1 and 2 feet behind Richard, he said that the moment he saw the car approaching he knew Richard was in trouble, he couldn't do a thing about it, because he knew Richard was a deaf mute. The only realistic interpretation of this evidence is that there was not sufficient time remaining in which a distance of not more than 2 feet could be gained by a small active boy on another who was supposed to be *walking*, not running, across the street. How far south of the parked car David and Richard were when they emerged was demonstrated to the jury on cross-examination by reference to steps, tables, and persons in the courtroom, but such evidence is worthless on appeal, since we have no diagram of the courtroom nor any statement of the distances.

By combining David's estimate of the location of the parked car with defendant's location of the point of impact, we can get a distance of some 50 feet more than defendant's estimate of the distance between the parked car and the boys at the time they emerged from behind it. However, as noted above, David testified that when he observed the distance of the oncoming car from Richard, Richard was beyond rescue. If the distance was greater than that indicated by defendants, then from David's testimony we can only conclude that defendants' speed was greater than the driver stated. That would perhaps prove negligence, but would still not prove that he had a last clear chance to avoid the accident.

All witnesses who attempted to locate the point of impact, with the exception of Linda, appellant's little sister, placed it on the westerly side of the street. All their testimony was that the boy was in motion up to the point of impact. Linda placed marks on the diagram designating where she first saw defendant's car and the point of impact. The only interpretation of her testimony would be that after the driver safely passed to the west of the boy he swerved his car eastward into him.

This case is distinguishable on its facts from those cases in which it is held proper to give the last clear chance instruction. In *Selinsky* v. *Olsen,* 38 Cal.2d 102, 105 [237 P.2d 645], there was evidence that plaintiff's car was stalled in defendant's lane of traffic from between five seconds and one minute and defendant's view was unobstructed. The court there said: ''Thus we do not have a case in which plaintiff's car was in motion or suddenly appeared in defendant's path as existed in the authorities relied upon by defendant. The jury could have inferred also, that defendant knew or should have known, in the exercise of ordinary care, that plaintiff could not escape. Under the evidence most favorable to plaintiff, defendant could have seen plaintiff's car standing in the road ahead of him for a minute before the impact and thus could, by the exercise of ordinary care, have avoided the accident.''

In *Young* v. *Carlson,* 128 Cal.App.2d 743 [276 P.2d 23], in considering the question as to whether it will be presumed, in spite of respondent's denial, that he did see appellant in time to have avoided the accident, the court said that it ''must be remembered that the basic rule is that plaintiff's perilous position must be actually discovered by the defendant, that is, the direct or circumstantial evidence must show actual knowledge. It is true that actual knowledge may sometimes be inferred, . . . but such inference can only be indulged in where from the evidence such inference is clear and positive. The inference may not be based on conjecture or speculation.'' (See also *Jobe* v. *Harold Livestock Com. Co.,* 113 Cal.App.2d 269 [247 P.2d 951].)

The District Court of Appeal in *Poncino* v. *Reid-Murdock & Co.,* 136 Cal.App. 223, 232 [28 P.2d 932], stated that the doctrine should not be applied where the ''act creating the peril occurs practically simultaneously with the happening of the accident and in which neither party can fairly be

said to have had a *last clear chance* thereafter to avoid the consequences. To apply the doctrine to such cases would be equivalent to denying the existence of the general rule which makes contributory negligence a bar to recovery.''

Appellant contends also that it was an abuse of discretion on the part of the trial court to refuse the proffered instruction on the ground that it was tendered too late. The instruction was not furnished prior to the taking of testimony, but appellant sought permission to present such instruction while testimony was still being offered, and a copy was served on respondent prior to argument.

The trial judge wrote upon the refused instruction that it "was not submitted in time." Section 607a, Code of Civil Procedure, provides that it shall be the duty of counsel "before the first witness is sworn, to deliver to the judge . . . and serve upon opposing counsel, all proposed instructions to the jury covering the law as disclosed by the pleadings." As to instructions on matters of law developed by the evidence and not disclosed by the pleadings, counsel may deliver them to the judge and serve them upon opposing counsel before the court commences instructing the jury and before argument. It is provided that the judge may disregard an instruction submitted later than required by this section, but if he does so disregard it he must write upon the margin of such proposed instruction that he refused to consider it for the reason that the requirements of this section have been disregarded. The words written on the proffered instruction that "it was not submitted in time" would seem to be substantial compliance with section 607a. In *Young* v. *Carlson*, 128 Cal.App.2d 743, 746 [276 P.2d 23], there was written on the instruction "Plaintiff's Last Clear Chance left with the Clerk Wed. Eve." That was the last day of the trial of that case. It was held that that was not substantial compliance because it did not show that the trial judge refused it because it was tardy, and it was therefore presumed that it was refused on the merits. In that case it was argued at length as to whether the issue of last clear chance was presented by the pleadings or was not disclosed until trial. The court did not rule upon that issue inasmuch as the case was one in which the instruction should not have been given. That is the situation here. Since the instruction was properly refused on the merits, it is not necessary to decide whether the judge's additional reason for refusing it was incorrect.

We conclude that the verdict and judgment find support in the record before us and that no prejudicial error appears therein.

Judgment affirmed.

Nourse, P. J., concurred.

DOOLING, J.—I dissent. While acknowledging the settled rule that an instruction on the last clear chance should be given if there is any evidence in the record which would reasonably support a recovery on that theory (*Bonebrake* v. *McCormick*, 35 Cal.2d 16 [215 P.2d 728]) the majority opinion minimizes and attempts to argue away evidence which, if accepted by the jury, is sufficient to support a recovery under the last clear chance doctrine. There is express and clear evidence in the record from which the jury would be entitled to find that the driver of the car saw the plaintiff in a position of peril at a point at least 80 feet from the point where plaintiff was struck. The witness, David Gjerdum, testified that as he saw the car approaching he heard a yell from the car and then the honking of its horn. He indicated a point on the diagram, which is designated "yell," where the car was when he heard the yell and a second point, which is designated "honk," where the car was when he heard the horn. The point designated "yell" scales slightly more than 80 feet to the point indicated on the map by the defendant driver as the point where his car struck the child. The defendant driver testified that his car was traveling at the rate of 20 miles per hour. At 20 miles per hour with brakes that satisfied the legal requirement the car could have been stopped in 37 feet. (Veh. Code, § 670, as it then read.) There were also 16 feet of clear space between the point of impact as designated on the map and the opposite curb into which the car might have been turned to clear the plaintiff.

My associates draw an inference from the evidence that if the car was 80 feet away when David heard the yell it must have been going faster than 20 miles per hour, because David, only a couple of feet from the plaintiff felt helpless to warn him. The opinion says in this regard: "The only realistic interpretation of this evidence is that there was not sufficient time remaining in which a distance of not more than two feet could be gained by a small active boy on another who was supposed to be *walking*, not running, across the street." I suggest that the jury might reasonably have drawn another

inference from this evidence. It seems at least as realistic to infer that if David had undertaken to overtake the plaintiff in his position in the path of the approaching car two little boys, instead of one, might have been struck and injured. The instinct of self-preservation would be enough to make David feel helpless in the face of this risk. It is for the jury to decide which of two, or more, reasonable inferences to draw from the evidence. It is only by putting its own less favorable construction on evidence which will reasonably bear a construction more favorable to the plaintiff that this court is able to conclude that the evidence is not sufficient to support a verdict on the last clear chance theory.

Appellants' petition for a hearing by the Supreme Court was denied December 16, 1955. Bray, J. pro tem., participated therein in place of Edmonds, J. Carter, J., and Traynor, J., were of the opinion that the petition should be granted.