[Civ. No. 26328.  Second Dist., Div. Three.  Aug. 7, 1963.]

JACK C. HOFFMAN, Plaintiff and Respondent, v. ALICE E. SLOCUM, as Executrix, etc., Defendant and Appellant.

Gilbert, Thompson & Kelly, Ernest L. Kelly and Jean Wunderlich for Defendant and Appellant.

Clifton A. Hix and Elizabeth Hix for Plaintiff and Respondent.

FILES, J.—This appeal is taken by the defendant, executrix of the estate of Philip Slocum, from a judgment entered in favor of plaintiff in a personal injury action following a nonjury trial. The judgment is based on the trial court's finding that plaintiff, the guest in an automobile driven by decedent, sustained serious injuries as the result of decedent's wilful misconduct in the operation of his vehicle. Slocum was fatally injured in the accident. Defendant contends that the evidence is insufficient to support the finding of wilful misconduct, and that the trial judge erred in admitting the opinion of a police officer regarding the speed of the Slocum car.

The accident occurred June 12, 1959, at about 10 p.m. on Henry Ford Avenue, six-tenths of a mile south of its intersection with Anaheim Street in the City of Los Angeles. Henry Ford is a 4-lane city street with a 9- to 10-inch concrete curbing. Northbound and southbound lanes are separated by a center double stripe. There are access roads onto Henry Ford from the adjacent oil fields. It is straight and level for the first 2,500 feet south of Anaheim Street. In the next 75 feet the roadway rises about 5 feet and over a metal grating bridge 125 feet long. A southbound driver cannot see traffic beyond it until his vehicle is on the bridge. South of the bridge the road again descends over the next 75 feet to its prior level and continues southward. There is a considerable dip both approaching and leaving the bridge.

The evidence of the cause of the accident is limited to the testimony of one passing motorist and the physical conditions which were observed after the accident. The driver did not live to testify, and the trial court struck the testimony of the plaintiff under Code of Civil Procedure, section 1880, subdivision 3. The record supports the inferences drawn by the trial judge as set forth in his written opinion, as follows:

''Disregarding and eliminating all of the plaintiff's testimony as to matters occurring prior to the death of the deceased, pursuant to section 1880, subdivision 3, Code of Civil Procedure, the evidence shows that the deceased operated his sports car over the raised fixed bridge at an extremely high rate of speed in the left or center lane of southbound traffic; that he approached another southbound vehicle from the rear in the same lane; that a northbound vehicle was approaching

which would prevent him from passing the southbound vehicle to the left of the double center line; that deceased suddenly applied his brakes in the center or left lane next to the double line at a point approximately 500 feet south of the fixed bridge; he turned his car to the right toward the curb lane and laid down 148 feet of four-wheel locked side skid marks to the edge of the roadway, jumped the curbing, struck a 16 to 18-inch power pole breaking it off just above its base and moving it over two or three feet from its base where it stood suspended by the high tension wires. The car tore down approximately 60 feet of chain link fence, swung around from a southwesterly direction to a southeasterly direction where it came to rest approximately 70 feet from the point where the car jumped the curb and approximately 30 or 40 feet from the broken power pole.''

The only eyewitness, a northbound motorist, testified: ''Well, I saw two sets of headlights coming toward me. It was 10:00 o'clock at night. There wasn't anything else to see, so a person looks at lights, and nothing particularly attracted me to them until suddenly the rear pair of headlights turned sharply right and I just had time to think, 'There is no road there,' when it crashed, and by that time I was almost opposite the accident and there was a big cloud of dust from the car rolling. As soon as I cleared the dust I made a U-turn, stopped and put out flares. I saw both of the injured men laying [sic] on the side of the road. The car was within the fence and I went to the car to see if anyone else was in there.'' At the time of the accident the weather was clear and the pavement dry. The posted speed limit on Henry Ford Avenue was 40 miles per hour.

■ Defendant contends that the evidence is insufficient to support the judgment in that it demonstrates at most that decedent was driving at a high rate of speed, and that this fact alone would not sustain a finding of wilful misconduct within the meaning of Vehicle Code, section 17158.

■ A driver of an automobile is liable for injuries to his guest where he has intentionally operated his vehicle with a wanton and reckless disregard of the possible consequences. (*Goncalves* v. *Los Banos Mining Co.*, 58 Cal.2d 916, 918 [26 Cal.Rptr. 769, 376 P.2d 833]; *Howard* v. *Howard*, 132 Cal.App. 124, 128 [22 P.2d 279].) ■ Since the driver will rarely, if ever, admit to having driven with the frame of mind which would render his behavior culpable under the guest statute, the intentional, wanton character of his be-

havior may be implied from the surrounding circumstances. (*Fuller* v. *Chambers,* 142 Cal.App.2d 377, 380 [298 P.2d 125].)

It is futile to assert that "speed alone" is not sufficient evidence of the driver's state of mind. In *Fisher* v. *Zimmerman,* 23 Cal.App.2d 696 [73 P.2d 1243], the court said (p. 701):

"It is generally held that mere speed, of itself, does not constitute wilful misconduct. This may not always be true. There may be a point at which the speed becomes so excessive, the danger of injury to the passenger so probable, that such extreme speed alone might be held to be wilful misconduct. Speed coupled with other circumstances has been held to constitute wilful misconduct."

As Judge Bishop observed in *People* v. *Nowell,* 45 Cal.App. 2d Supp. 811 [114 P.2d 81], at page 813: "If we wished to be pedantic we would note that speed is never 'in itself and alone.' Of necessity, when referring to the speed of an automobile, there is involved the highway on which it travels, with its width, surface and the presence or lack of traffic upon it. There is involved, too, the factor of visibility; was the car driven before or after dark? When considered in relation to these matters mere speed, without other acts, may demonstrate wilful misconduct or that the driving is reckless."

Unquestionably this case involves more than just speed. With the consent of the parties, the trial judge viewed the scene of the accident. He observed the raised metal bridge which, he concluded, made it impossible for a southbound driver to observe traffic beyond the bridge. He noted the considerable dips in the roadway both before and after the bridge. There was evidence in the record from which he could infer that decedent driver was familiar with these road conditions, including the posted speed limit of 40 miles per hour. Here the conjunction of high speed and the obstruction of his vision by the bridge rendered decedent incapable of coping with one of the commonest of traffic situations—the overtaking of slower traffic while meeting an oncoming vehicle. The trier of the fact was entitled to infer that this was not simply an error of judgment or a momentary lapse of attention on the driver's part. The evidence supports the finding of a wanton disregard for the safety of both driver and passenger.

Defendant argues that it was error to allow Officer Pipp of the Los Angeles Police Department to testify that in

his opinion the decedent's car was traveling at least 80 miles per hour immediately prior to the accident. It is defendant's view that the witness was not properly qualified to make a determination of speed based on the physical conditions observed after the vehicle came to rest, and that, in any event, the subject is not one for expert testimony.

Officer Pipp had been in the accident investigating unit of the police department for 12 years. During that time he had investigated 5,000 accidents. As part of his training he had attended two courses in accident investigation. These courses included instruction in the use of skid marks to determine speed. This officer had arrived at the scene of the accident a little more than an hour after its occurrence. He personally observed the condition of the road, the damaged power pole and fence, the position of the decedent's vehicle, as well as the damage it sustained. He measured the skid marks and took photographs which were introduced into evidence. He testified to his observations of the accident scene.

Officer Pipp's estimate of speed was not based on the length of skid marks alone. The hypothetical question posed to elicit his opinion asked him to consider such other factors as physical damage caused by the car before it came to a halt. On cross-examination the officer testified that if the decedent's car had stopped without impact at the end of its 148-foot skid, he would estimate its speed to have been about 60 miles an hour. His conclusion, then, that the vehicle was traveling at least 20 miles faster was based in large part on his personal observations of the damage done after the vehicle left the pavement.

The propriety of expert or opinion testimony as to speed based upon the length of skid marks has been generally accepted. (*Jobe* v. *Harold Livestock Com. Co.*, 113 Cal.App.2d 269, 272 [247 P.2d 951]; *Linde* v. *Emmick*, 16 Cal.App.2d 676, 685 [61 P.2d 338].) In *Berkovitz* v. *American River Gravel Co.*, 191 Cal. 195, 201 [215 P. 675], the court held it was error to exclude expert testimony as to whether the damage to defendant's vehicle could have been caused by a Dodge car traveling at a speed of 20 miles an hour.

In other cases opinions as to speed based upon the physical condition of the wreckage have been held inadmissible. (*Johnston* v. *Peairs*, 117 Cal.App. 208, 214 [3 P.2d 617]; *Rudat* v. *Carithers*, 137 Cal.App. 92 [30 P.2d 435]; *Stephanofsky* v. *Hill*, 136 Conn. 379 [71 A.2d 560]; see Notes 133 A.L.R. 726; 156 A.L.R. 382.)

It is unnecessary to engage in any extended discussion of the use of expert testimony to describe an occurrence from its physical consequences because we are satisfied that the admission of the officer's opinion does not justify a reversal and retrial of this case. Officer Pipp did not purport to state the speed of the vehicle upon the basis of any scientific application of the principles of physics. He was simply a man who had seen more wreckage than most, and for 12 years it had been his business to observe the consequences of highway accidents and study their causes. The trial judge was willing to listen to the opinion of this witness before he reached his own conclusion as to the speed of the vehicle. The limitations upon the expertise of the witness were well known to the trial judge, who had before him all the physical facts from which the witness made his estimate. The opinion or estimate of the witness had no weight except such as the judge chose to give it, after considering all of the evidence, in the light of his own experience as a user of the highways. In denying a motion to strike the officer's opinion, the trial judge said: "I think we can all apply a little common sense here. I think we can take judicial notice about the common use of skid charts. We have all driven automobiles for a long, long time. We know that a car that skids 148 feet, goes off [sic] a cement curbing, strikes a 16-inch pole, breaks it off, and travels another 70 feet or so wasn't going 5 miles per hour."

In his written opinion the trial judge said: "The Court is likewise satisfied and finds, based upon common knowledge and experience as well as [Officer Pipp's] opinion, that this vehicle was of necessity traveling at least 80 miles per hour, upon said physical facts."

The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied August 30, 1963, and appellant's petition for a hearing by the Supreme Court was denied October 1, 1963.